Robert M. JENNI and Helen A. Jenni, Plaintiffs-Respondents,

v.

E.R.B. LAND, INC., a Missouri Corporation, Defendant-Appellant,

John M. Gamel et al., Defendants.

No. 36568.

Missouri Court of Appeals, St. Louis District, Division Two.

Sept. 14, 1976.

after a State's witness had testified to an out-of-court identification.

744

Earl R. Blackwell, Hillsboro, for defendant-appellant.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Myron Gollub, Frank Hamsher, St. Louis, for plaintiffs-respondents.

KELLY, Judge.

E. R. B. Land, Inc., the defendant-appellant, brings this appeal to review a judgment of the Circuit Court of Jefferson County decreeing that the plaintiffs-respondents have a security interest in a 78 acre

parcel of land situate in Jefferson County and which security interest it established as a prior lien to defendant-appellant's interest in said tract of land together with a declaration that defendant-appellant is a constructive trustee with respect to plaintiffs-respondents' security interest therein.

This cause was instituted against the E. R. B. Land, Inc., John M. Gamel and Mildred Gamel, his wife, John Clyde Gamel, and David Edgar Gamel. Count I of the petition sought a declaration that certain quit-claim deeds from the Gamels to E. R. B. Land, Inc., were void and that the Gamels be directed to execute and deliver to the plaintiffs a first deed of trust conveying the real estate in trust for the plaintiffs to a trustee to be designated by the Court. Count II of the petition sought active damages against the Gamels in an amount of $33,561.84, plus interest at 6% per annum and $150,000.00 exemplary damages for alleged false representations relative to execution and delivery of a second deed of trust to secure the plaintiffs for the balance due on the sale of the real estate. Count III prayed the trial court to declare that the E. R. B. Land, Inc., was a constructive trustee of plaintiffs' interest in the land, and that E. R. B. Land, Inc., be directed to convey its interest in the land to plaintiffs.[1]

Counts I and III of the petition, being equitable in nature, were tried to the court; Counts II and IV were dismissed by the respondents-plaintiffs at the close of all of the evidence.

The evidence was that the 78 acres involved in this cause of action was part of what was originally a 200 acre farm owned by the Jennis. In July, 1966, they sold off approximately 122 acres of this farm to Robert M. Williams of the Sunset Realty Company, of Hillsboro. Prior to that time they had sold one acre to the City of Festus. In August, 1966, the Jennis entered into negotiations with John M. and Mildred Gamel for the sale of the remaining 75 acres of the farm. Mr. Gamel retained the services of an attorney, J. W. Thurman, of Crystal City, to prepare the necessary legal documents. According to Mr. Thurman, he met with the parties to the sale in his home, where he drafted the necessary legal papers, including a contract, a note, a deed of trust and a deed. The Agreement for Purchase of Realty provided that the purchase price for the tract of land was $39,000.00, of which the Gamels had paid $5,000.00 as earnest money; that the balance of $34,-000.00 was to be paid in equal monthly installments of $219.08 over a period of 25 years, to be secured by a note and deed of trust on the premises "in the form ordinarily used in this state." The $5,000.00 earnest money for the down payment had been borrowed by John and Mildred Gamel from Mr. Gamel's father and he was given a deed of trust as security for the loan.

Mr. Jenni testified that on the day the documents were executed at Mr. Thurman's home, sometime in August, 1966, the Agreement for Purchase of Real Estate was notarized by Mr. Thurman and dated August 12, 1966 and Mr. Jenni testified that is the date on which he received the $5,000.00 earnest money. The note for $34,000.00, dated July 1, 1966, and a copy of the amortization schedule, along with a copy of the Agreement for Purchase of Real Estate, were given to Mr. Jenni. The deed was not executed on that visit to Mr. Thurman's but a couple of weeks after they had been at Mr. Thurman's home, Mr. Jenni received a letter and the warranty deed through the mail from Mr. Thurman. The letter accompanying the warranty deed contained instructions that the Jennis should go before a notary and sign the deed before the notary and then give the warranty deed to the Gamels. The Jennis did as instructed and the warranty deed was executed on September 6, 1966. Although Mr. Thurman testified that he prepared a deed of trust on the property, as well as a chattel mortgage on some personalty and a second note, and

1. Count IV was not included in the transcript. Respondents, in their brief, advise us that it was an action whereby they sought to recover damages against all of the defendants for conspiracy to defraud the plaintiffs in an amount of $33,000.00 actual and $150,000.00 exemplary damages.

he delivered the note, deed of trust, copy of the sales contract, the note and the chattel mortgage on the personalty, and "I delivered these papers that Mr. Jenni was entitled to." When they left his home the Jennis took "all the executed papers with them." Mr. Jenni denied ever receiving the deed of trust, explaining this by testifying that it was his understanding that Mr. Thurman would "do everything that's needed to complete this sale." It is conceded that no deed of trust securing the balance due as evidenced by the note was ever filed in the office of the Recorder of Deeds of Jefferson County. The deed of trust securing the $5,000.00 loan from Mr. Gamel's father, however, was recorded.

For more than two years the Gamels made the monthly payments on the property in accordance with the amortization schedule until October 1, 1968, after which date they made no further payments. The principal amount remaining unpaid as of that date was $32,584.99.

In February, 1969, Mr. Williams came to Mr. Blackwell, the president and sole shareholder in E. R. B. Land, Inc., and informed Mr. Blackwell that he had been approached by Mr. and Mrs. John Gamel, Sr., with respect to buying the $5,000.00 deed of trust and after questioning Mr. Williams about the property and what it was worth, authorized Mr. Williams to go ahead and negotiate for the purchase of the note and deed of trust. Mr. Williams purchased the note and deed of trust for E. R. B. Land, Inc., for $3,450.00. At the time of purchase of the note no payments on either principal nor interest had been made by the John M. Gamels.

A week or so after the purchase of the $5,000.00 note and deed of trust, Mr. Williams asked Mr. Blackwell if he would be interested in buying the 28 acres inasmuch as he believed the place could be bought. Mr. Blackwell told Mr. Williams to go

ahead and try to buy it, and Mr. Williams undertook negotiations for the purchase of the tract, obtaining from the Gamels an option contract for the purchase of their equity in the farm for $2,000.00, plus the cancellation of both of the outstanding obligations of the Gamels to both the Gamel, Srs., and the Jennis. This transaction was completed on February 19, 1969, with Williams making payment to the Gamels, the execution of three quit claim deeds for the property from the Gamels to E. R. B. Land, Inc.,[2] and the recording of those deeds by Mr. Williams, in the office of the Recorder of Deeds of Jefferson County. Mr. Williams was the only one representing E. R. B. Land, Inc., to have any contact with the Gamels throughout these negotiations resulting in the purchase of the property; Mr. Blackwell never, at any time, took part in the negotiations.

At trial, Mrs. Gamel testified by deposition that during the negotiations for the sale of the property she had informed Mr. Williams that she and her husband were behind in their payments to the Jennis, and that she showed him the schedule of payments for the note, and told Mr. Williams that she and her husband were obliged to pay off the note. She testified that Mr. Williams replied by saying that he would pay the Gamels for their equity in the land. Although Mr. Williams did not specifically say that he would satisfy the note to the Jennis, he did state that he would "take care of the rest of it." At at the last meeting, as they were preparing to sign the papers, Mrs. Gamel remarked: "Now that pays off___ that cancels the $5,000.00 note that you bought from my father-in-law, that pays off Mr. Jenni . . . Then that gives us $2,000.00 for our equity." Mr. Williams replied: "Yes, that is right." She further testified that before she received any money for the property she and Mr. Williams, on a number of occasions, discussed all of the obligations concerning the

2. Title to the property was taken in the names of John Melvin Gamel and Mildred Gamel, his wife; John Clyde Gamel and David Edgar Gamel, as joint tenants or to the survivor of them. The quit claim deeds were executed by John Melvin Gamel and Mildred Gamel, his wife, by John M. Gamel for John Clyde Gamel as "Authorized Attorney-In-Fact Empowered to Sell the Aforesaid Real Estate," and by David Edgar Gamel and Janis Lee Gamel, his wife.

sale of the property, including the Gamels' financial obligations to the Jennis. Prior to his purchase of the property, she did not notify Mr. Blackwell of any debt, or encumbrance by deed of trust against the property. All of her dealings were with Mr. Williams and she did not know at that time who it was who was actually purchasing the property. She learned later that Mr. Blackwell had an interest in the purchasing corporation.

After her first meeting with Mr. Williams, according to Mrs. Gamel, Mr. Jenni visited the farm and at that time was advised that the Gamels had a customer who was going to buy the farm, that they were dealing with Mr. Williams, and when they sold the farm Mr. Jenni would get his money. Mr. Jenni testified that he called Mr. Williams and described to him the instruments concerning the debt due him from the Gamels and that he subsequently sent a copy of the amortization schedule for the balance owing on the purchase price, what each monthly payment was, how much of it was principal and how much was interest, the payments which were past due and the interest due thereon, up to that time. He further advised Mr. Williams that if he needed any more information, he, Mr. Jenni, would be glad to supply it. By letter of March 1, 1969, Mr. Williams returned to Mr. Jenni the papers Mr. Jenni had furnished him, advised him that "the apparent deed of trust came as a surprise" to him and that his only involvement in the transaction was to act as an agent for the purchaser and owner, E. R. B. Land, Inc., of which Mr. Blackwell was President, and that any further inquiries should be directed to Mr. Blackwell.

Mrs. Gamel testified that at the time Mr. Williams presented her with the option to purchase contract of February 14, 1969, a discussion ensued relative to a paragraph contained thereon which reads, "Property is subject to the following deeds of trust and none other, now of record in the Recorder of Deeds Office, Hillsboro, Missouri." She

was somewhat confused on this point as is evidenced by her statement that the "none" she was referring to was the "None" written in someplace on the Option Contract. She testified that the word " 'None' was there separate by itself . . ." and when she inquired about this, Mr. Williams explained to her that this meant they didn't go out and borrow any extra money. She testified that it seemed to her Mr. Williams brought her a different piece of paper than the Option Contract where the word "None" was written down by itself. The Option Contract contains no reference to any deed of trust other than those "now of record in the Recorder of Deeds Office Hillsboro, Missouri." The only place the word "NONE" appears on the document is in that portion of the Option Contract which recites that there is to be no return deed of trust. However, at this same discussion, Mrs. Gamel testified that she asked Mr. Williams if, when he gave them "this money" and they signed the papers, would that then pay off the $5,000.00 note Mr. Williams had bought from her father-in-law, the amount owed to Mr. Jenni, and give them the $2,000.00 for their equity in the property. Mr. Williams replied: "Yes, that is right." Throughout the negotiations for the sale of the property she made it clear to Mr. Williams that they wanted to get out of the sale of the property an amount sufficient to pay off the loan to her father-in-law for the monies loaned to them to make the $5,000.00 down payment on the property, the monies they owed the Jennis for the balance of the purchase price, and $2,000.00 for their equity. Mr. Williams assured her that all of these items would be taken care of.[3]

Approximately one month after the sale of the farm to E. R. B. Land, Inc., Mr. Jenni having been informed of the sale and being unable to get Mr. Williams to agree that the purchaser would assume the balance due on the property from the Gamels, met with Mr. Blackwell in an effort to resolve the matter. Mr. Jenni did not receive any

---

3. Mr. Gamel did not testify at the trial but some of his Answers to Interrogatories directed

to him by the plaintiffs were read into evidence as admissions against interest.

satisfaction in this respect and instituted this litigation.

Plaintiffs adduced evidence at trial that the fair market value of the tract on the date of purchase by the E. R. B. Land, Inc., was $53,000.00.

The evidence adduced by the defendant E. R. B. Land, Inc., was that of Mr. Thurman, the attorney handling the preparation of the legal documents, and which has been referred to hereinabove, Mr. Blackwell, the President and sole shareholder in E. R. B. Land, Inc., and excerpts read from the deposition of Mrs. Gamel. The thrust of Mr. Blackwell's testimony was that he had authorized the purchase of the $5,000.00 note and deed of trust from Mr. Gamel's father for approximately $3,500.00 and the tract of land. Mr. Williams had advised him that the Gamels were talking of selling the land in terms of $2,000.00 or $2,500.00. He denied any knowledge of any encumbrances on the land other than the $5,000.00 note and deed of trust which he had previously purchased from Mr. Gamel's father through Mr. Williams and testified that he at no time dealt directly with the Gamels but the entire transaction was handled by Mr. Williams. He had Mr. Williams order a Certificate of Title which showed only the deed of trust for security for the $5,000.00 loan from Mr. Gamel's father. He had never seen the Gamels until Mrs. Gamel's deposition was taken in California and he had never seen either of the Jennis prior to the date on which Mr. Jenni came to his office some months after the sale of the property had been consummated. He testified Mr. Williams never told him about any possible indebtedness against the property and he had no knowledge of this encumbrance. He stated that while he did not have any knowledge of the sales prices for property adjacent to the land he had purchased, he was of the opinion that the land was worth between $10,000.00 and $12,000.00 and the consideration he paid for the land was in the neighborhood of $7,500.00, if one counted the note and the interest due thereon.

At the conclusion of Mr. Thurman's testimony, defendant's counsel advised the court that he would like to introduce the deposition of Mr. Williams and would read it if the trial court wanted to hear it; otherwise, he was going to offer "the whole thing." Plaintiffs' counsel objected on the ground that Mr. Williams was not a party and the deposition revealed that he was a resident of Jefferson County. When asked by the trial court if Mr. Williams was a resident of the county, Mr. Blackwell replied that he was and that he lived in Hillsboro. The trial court inquired if Mr. Blackwell could locate him and Mr. Blackwell replied that he did not think so. The trial court then inquired if counsel had issued a subpoena for him and counsel replied that he had not, because he was relying on the plaintiffs, who had taken the witness' deposition, to offer it and if they did not, then he would. The trial court suggested that they recess for a few minutes and that Mr. Blackwell see if he could call the witness. After the recess, Mr. Blackwell again offered the deposition of Mr. Williams because "Mr. Williams is physically unavailable as a witness. He is outside of the State of Missouri." Plaintiffs' counsel objected "under the provisions of Rule 57.29(b)" because the deposition showed on its face that the witness is a resident of the county and is not a party to the suit, and the other provisions which might authorize the use of the deposition under Rule 57.29(b) had not been shown. The trial court then asked if any subpoena had been issued for the witness and Mr. Blackwell again replied that none had been issued. The trial court ruled that "the deposition will not be accepted if there was no subpoena issued for the witness prior to this time."

Mr. Blackwell thereupon advised the trial court that he wanted to testify. He was sworn and testified, as previously stated, relative to the issues in the trial of the cause. At the conclusion of his testimony he read from Mrs. Gamel's deposition and when he had finished that, recalled himself to the stand to testify further in support of his offer of Mr. Williams' deposition. On this occasion, Mr. Blackwell testified that it is the practice in the Circuit Court of Jefferson County not to order subpoenas

through the office of the Clerk of the Circuit Court but rather, for the attorneys to obtain blank subpoenas, which he did, and that when he checked on Monday he discovered that Mr. Williams was on vacation and out of the state. One of the blank subpoenas he had obtained from the Clerk for the trial would have been used to subpoena Mr. Williams had Mr. Williams been here or had he been within reach of the subpoena. He used one of the subpoenas on Mr. Thurman, and the other two blank subpoenas were in his file at the time. Mr. Williams, through no fault of Mr. Blackwell's, was not physically present where he could be reached by subpoena, and he was offering the deposition because Mr. Williams was physically unavailable. Plaintiffs repeated their objections and the trial court ruled that the case had been "set definitely for today for many weeks. Seems to me like the witness could have been subpoenaed," and let his ruling stand. Defendant E. R. B. Land, Inc., then closed its case.

The Gamels offered no evidence, and it was then that the plaintiffs' causes of action in Counts II and IV were dismissed.

The trial court's judgment is that as of July 10, 1974, the Jennis jointly have a secured interest in the real estate in issue in the sum of $50,545.86, arising out of an indebtedness created by a note in the amount of $34,000.00 dated July 1, 1966, together with interest from and after said date at the rate of 6% per annum until paid, executed by the Gamels, and an unrecorded deed of trust securing the note and encumbering the realty in favor of the Jennis; that the secured interest arising out of the indebtedness is established as a lien on the said realty. The judgment further declares the quit-claim deeds conveying the property to E. R. B. Land, Inc., to be null and void and of no effect as to the Jennis, and that E. R. B. Land, Inc., is the constructive trustee in respect of such secured interest of the Jennis in the amount of $50,545.86, which total sum is found to be in default as of July 10, 1974, and which has been in default in part since November 1, 1968; that on February 19, 1969, the principal

amount of $32,584.99 and accumulated interest thereon in the amount of $760.53 was in default, when the conveyance of the property to E. R. B. Land, Inc., took place; the lien was declared to have priority over the deed of trust securing the loan from Mr. Gamel's father for the downpayment on the purchase price of the property. The judgment further provided that unless the total sum of $50,545.86, plus interest from July 10, 1974, is paid to the plaintiffs within 30 days of the date on which the judgment became final, the equity of redemption in the property is foreclosed and the plaintiffs shall recover the full amount with interest together with their costs of this action and costs of execution. Special execution in foreclosure was ordered issued to the Sheriff of Jefferson County after 30 days from the date on which the judgment became final, without further order of court, upon the filing of plaintiffs' affidavit that all or any part of the indebtedness constituting their secured interest in the real property, together with costs of this suit, has not been received by plaintiffs. The Sheriff was directed to advertise and conduct a public sale under the special execution in foreclosure on behalf of the constructive trustee in accordance with law.

Only E. R. B. Land, Inc., appeals from this judgment of the trial court.

On appeal two points are presented for review: (1) that the trial court erred in refusing to admit the deposition of Mr. Williams, and (2) that the trial court erred in entering judgment that plaintiffs' security interest superseded the prior and separate deed of trust purchased by E. R. B. Land, Inc., from the father of Mr. Gamel.

██ Appellant at trial did not make an offer of proof after his request to read into evidence the deposition of Mr. Williams had been denied. Generally, in the absence of an offer of proof the point appellant seeks to present here would not be preserved for review. *Elliott v. Richter*, 496 S.W.2d 860, 864[1] (Mo.1973). There is, however, an exception to this general rule embodied in Rule 79.04 in the case of "plain errors" where the appellate court deems that mani-

fest injustice or miscarriage of justice has resulted therefrom. We have, in this case, another factor we believe worthy of consideration in deciding whether to review this point in the absence of the necessary offer of proof. Although there were no findings of fact nor conclusions of law requested nor made, we conclude that in the absence of the filing of the deed of trust by Mr. Jenni in the office of the Recorder of Deeds, whether it was to be filed by Mr. Thurman or not, the trial court had to arrive at its decision on one or two of the theories contained in respondents' petition, i.e., 1) that the knowledge of the missing witness, Mr. Williams, was the knowledge of the appellant because of the principal-agency relationship, or 2) that the appellant had actual knowledge of the existence of other encumbrances or should have been on notice to make inquiry concerning such by reason of the inadequacy of the purchase price he had paid for the property. Which one, we do not know. If on the former, the testimony of Mr. Williams was essential for appellant's defense. Respondents offered and introduced into evidence a letter from Mr. Williams to Mr. Jenni dated March 1, 1969 —"Plaintiffs' Exhibit No. 6"—wherein Mr. Williams said: "While the apparent deed of trust came as a surprise to me . . . ." This statement might shed some light on what Mr. Williams' testimony might have been had the deposition been admitted. In its brief, appellant asserts that without Mr. Williams' deposition it has no proof to counter the assertion of Mrs. Gamel that Mr. Williams had knowledge of the indebtedness to the Jennis; this, for the reason that it was Mr. Williams who handled all of the negotiations and the ultimate purchase of the tract of land from the Gamels. We decide then, that since this was an equitable proceeding, this point should be reviewed because by the trial court's ruling appellant was precluded from presenting any effective defense to respondents' claim, if any it has.

The reading and use of depositions in evidence at trial and the circumstances under which they may be read is set out in Rule 57.29(b). One of the grounds enumerated therein is when the "witness resides or is gone out of the state." Rule 57.29(b)(1). It is this ground upon which appellant offered the deposition of Mr. Williams. The trial court in denying the offer stated that the deposition would not be admitted if there was no subpoena issued for the witness "prior to this time." Mr. Blackwell, appellant's attorney of record and the attorney handling the defense of the claim, advised the trial court that no subpoena had been issued for the witness. Subsequently, after the recess to ascertain whether Mr. Blackwell could "call" the witness, and while under oath, Mr. Blackwell undertook to explain the practice in Jefferson County—the trial judge being from another circuit and sitting in lieu of the two judges of the county who had disqualified themselves—with respect to subpoenaing witnesses and again advising the trial court that the witness was gone out of the state, the trial court reiterated its prior ruling and in doing so stated that the case had been set for trial for several weeks and "Seems to me like that witness could have been subpoenaed."

It is the appellant's contention that upon the showing that the witness was gone out of the state, the trial court should have admitted the deposition; that in failing to do so the trial court erred and precluded it from presenting a defense to the respondents' claim. Respondents, on the other hand, argue that the admissibility of a deposition is discretionary with the trial court and in the absence of an abuse of that discretion the trial court's ruling will not be disturbed on appeal. The thrust of respondents' argument is that the appellant made no effort to obtain service of a subpoena or check on Mr. Williams' availability until two days prior to trial; that the appellant "did not meet even the preliminary condition of Rule 57.29" because it did not establish any of the exceptions of subsections (b)(1) through (6) in that the testimony establishing these exceptions must come from the testimony of the deposing witness, the certificate of the officer taking the deposition, or the testimony of the person

or officer who attempted to serve the witness with a subpoena, and in the absence of said testimony no deposition can be received into evidence regardless of any possible applicable exception listed in subparagraphs (b)(1) through (b)(6).

The refusal of the trial court to receive in evidence the deposition of Mr. Williams on the grounds stated, i. e., the failure of appellant to obtain a subpoena, was error. The grounds upon which appellant sought to introduce into evidence the deposition of Mr. Williams was that the witness was gone out of the state. Rule 57.29(b)(1). When a deposition is introduced on that ground, the party offering the deposition has the burden of establishing, as a condition precedent to its admission into evidence, that the witness is "gone out of the state." Whether a subpoena was issued and a non-est return thereon made is irrelevant, if, in fact, the witness "is gone out of the state," and the issuance of a subpoena followed by a non-est return is not, in and of itself, sufficient evidence to prove that the witness "is gone out of the state," *Heinbach v. Heinbach,* 262 Mo. 69, 170 S.W. 1143, 1148 (1914); *Francis v. Willits,* 30 S.W.2d 203, 205 (Mo.App.1930), anymore than the failure to procure the issuance of a subpoena and a non-est return is evidence that the witness is not "gone out of the state." That issue would at best be directed to whether the party offering the deposition into evidence had exercised due diligence in procuring the attendance of the witness at trial, as required by Rule 57.-29(b)(6), as a condition precedent to the use of the deposition *if offered on that ground when the witness is absent.* The admissibility of a deposition is determined by the ground on which it is offered and the factual basis proved by the party offering the deposition at the time the offer is made. *Null v. Gray,* 534 S.W.2d 823, 825 (Mo.App. 1976), *Maplewood Planing Mill & Stair Co. v. Pennant Construction Co.,* 344 S.W.2d 629, 633 (Mo.App.1961).[4]

While it is the general rule that the sufficiency of the evidence to support the admissibility of a deposition pursuant to Rule 57.29(b) rests largely within the discretion of the trial court, *Myers v. Karchmer,* 313 S.W.2d 697, 701[1] (Mo.1958), where, as here, the trial court did not rule on the question whether the evidence was sufficient to support the ground on which the offer of the deposition was made, but rather, erroneously ruled on the basis of a ground on which the offer was not made, this rule has no application. From the record in this case it is clear that the refusal of the trial court to permit the appellant's counsel to read the deposition was because he had not had a subpoena issued for the witness, which in our opinion he was not obliged to do.

While much of respondents' argument is directed to the "lack of diligence" of appellant's counsel in waiting until two days prior to the commencement of the trial to determine the availability of Mr. Williams and the contention that such lack of diligence was sufficient to support the trial court's ruling, the cases cited by respondents may be distinguished. *Kagan v. St. Louis Public Service Company,* 360 S.W.2d 261, 269 (Mo.App.1962) was not a case where the deposition was offered pursuant to the provisions of Rule 57.29(b)(1), wherein it is expressly provided that not only must the witness be absent without the consent, connivance or collusion of the party requiring his testimony, but that same party must also have exercised due diligence but nonetheless been unable to procure the attendance of the deponent by subpoena.

Our research has led us to no case wherein a court of this state has held that as a condition precedent to the reading into evidence at trial of the deposition of a witness who has "gone out of the state" the party offering same must show due dili-

---

4. We do not here rule on what would be the holding in a case where there is in the record evidence that a witness was "gone out of the state" with the consent, connivance or collu-

sion of the party seeking to read into evidence that witness' deposition. There is no evidence nor claim that that was the situation here.

gence and that despite the exercise of due diligence said party was nevertheless unable to procure the attendance of the deponent by subpoena. The Rule and grounds under which this deposition was offered into evidence permits the reading of the deposition "if the witness resides *or* is gone out of the state." (Emphasis supplied). Unlike subdivision (6) of paragraph (b) there is no requirement that the party offering the deposition into evidence must preliminarily prove to the satisfaction of the trial court that the witness "is gone out of the state" and that the party requiring his testimony, in the exercise of due diligence, has been unable to procure the attendance of the deponent by subpoena. We reason that had the Supreme Court deemed a condition precedent of this kind desirable the same due diligence and subpoena condition precedent would have been incorporated in the first ground under paragraph (b). Whether such a requirement is desirable is not the question before us, for it is not for the Court of Appeals to graft onto a Rule of the Supreme Court conditions which that Court did not see fit to require, no matter how worthy the condition precedent might be.

In *Averitt v. Metropolitan St. Ry. Co.,* 151 Mo.App. 265, 131 S.W. 752 (1910) there is some dictum with respect to due diligence where a deposition was read into evidence on the statutory grounds that the witness resided in a county other than that in which the trial is held, or the witness was gone to a greater distance than forty miles from the place of trial without the consent, connivance or collusion of the party requiring her testimony. § 2904 Rev.St.1899 (Presently § 492.400.2(4)). Evidence that the witness at the time of the taking of her deposition, three years before trial, was employed in Kansas City, but her home was in Plattsburg, Clinton County, more than 40 miles from Kansas City, and that at the time she was contemplating a visit to her mother at that place, together with the fact that the plaintiff had a subpoena issued for her and it was returned non-est, that plaintiff's counsel had made diligent efforts to locate her, and that she could neither be found in Kansas City nor her whereabouts ascertained. Such evidence was certainly relevant on the issue whether the witness was absent without the consent, connivance or collusion of the party requiring the testimony, even if not necessary on a question of due diligence. See: Anno.: Construction of statute or rule admitting in evidence deposition of witness absent or distant from place of trial. 94 A.L.R.2d 1172.

As we view the Rule it provides for six circumstances or "facts" which authorize the reading in evidence at trial of a deposition of a witness and each of these are, we conclude, separate and distinct grounds authorizing a party to read a deposition of a witness into evidence upon proof to support the particular grounds upon which the party relies, and we believe that this conclusion is supported by decisional law of the courts of this State.

In *Will Doctor Meat Co. v. Hotel Kingsway,* 232 S.W.2d 821, 824[4] (Mo.App.1950), the defendants sought to introduce and read into evidence the deposition of one of the co-defendants taken by the plaintiff but the trial court excluded the deposition when plaintiff objected on the ground that there had been no showing that the deponent was absent from the trial without the consent, connivance, or collusion of the defendants offering the deposition. At the time of the giving of the deposition the deponent was a resident of Kansas City, Missouri, visiting in St. Louis on business when he was produced by the defendants' counsel at the office of the plaintiff's attorneys so that his deposition could be taken. In reversing the trial court on this ground, this court said, l. c. 824[4]:

"Since Steinbaum did not reside in the City of St. Louis where the trial was being held, it was immaterial upon the question of the admissibility of his deposition whether he had gone to a greater distance than forty miles from the place of trial without the consent, connivance, or collusion of the parties requiring his testimony. . . . *Absent any other valid ground of objection, it was enough,*

*under Section 1944 (presently Section 492.400.2), to warrant the reading of the deposition that Steinbaum was shown to have gone out of the state."* (Emphasis supplied).

See: Anno. Construction of statute or rule admitting in evidence deposition of witness absent or distant from place of trial. 94 A.L.R.2d 1172, et seq.

Respondents' argument that proof of the facts authorizing the reading of the deposition into evidence must be established by the testimony of the deposing witness, or by the certificate of the officer taking the deposition or the testimony of the person or officer who attempted to serve the witness with a subpoena is likewise without any legal basis. For many years it has been the law in this state that those methods of proof are not the exclusive means for proving the facts authorizing the reading of a deposition under the Rule or under the statute, § 492.400 RSMo. 1969. In *Doyle v. St. Louis Transit Co.*, 124 Mo.App. 504, 101 S.W. 598, 599[1] (1907) this court held that Rev.St.1899, c. 18, Sec. 2904 (Ann.Stat.1906, p. 1669) relating to the taking of depositions and providing that the facts which authorize the reading of a deposition may be established by the testimony of the same person enumerated in the present Rule were not conclusive as to the modes of proof, and that a party may resort to other sources to lay a proper foundation for the introduction of the deposition. The Kansas City District of this court followed the holding of *Doyle* in *Coffel v. Spradley*, 495 S.W.2d 735, 737[5] (1973) when it ruled that the facts authorizing the reading in evidence of a deposition on the ground that the defendant was dead, Rule 57.29(b)(2), could be established by means other than those enumerated in the Rule.

Furthermore, by the manner in which the trial court made its ruling we conclude that appellant's counsel was caused to believe that the question in the trial court's mind was not whether the witness had gone out of the state, but rather whether a subpoena had been obtained for service upon him. In this view of the trial court's ruling any further evidence that the witness had gone from the state would have been to no avail.

Respondents, in the trial court, did not challenge the question whether Mr. Williams was gone out of the state; they relied there on the failure of the appellant's counsel to determine the witness' absence from the state until two days prior to the date of trial and the argument that appellant's proof did not comply with the methods enumerated in Rule 57.29(b). Here they argue that Mr. Blackwell's statement and testimony that Mr. Williams was gone out of the state is "rank hearsay" and that "[t]he record is devoid of any showing how appellant's attorney had 'checked' on the availability of Mr. Williams, what efforts he had made to find a witness, with whom he had talked, *what he had been told,* . . ." (Emphasis supplied). This testimony came in without objection during Mr. Blackwell's testimony under oath; no cross-examination was conducted on this point by respondents. They did not raise the insufficiency of the evidence to prove that Mr. Williams was gone from the state in the trial court.

What evidence is sufficient to prove that a witness is gone out of the state so that his deposition may be read in evidence is generally left to the discretion of the trial court as respondents have heretofore pointed out. In *Adkison v. Hannah,* 475 S.W.2d 39, 42[5] (Mo.1972) the court, on appeal and deciding whether plaintiff had made a submissible case, took into consideration the testimony of a witness in a deposition offered by the respondents despite the appellants' objection that there was not a sufficient showing that the witness had gone out of the state at the time the deposition was offered. The deposition was offered in the trial court under subparagraph (1) of § 492.400 subd. 2 authorizing the use of a deposition upon a showing that the witness resides or is gone out of the state. The evidence relied on for that purpose was the testimony of the defendants that for four weeks prior to the trial they got in touch with the witness by telephone at a "Kansas number." In this case (tried in the

Circuit Court of Clay County) the evidence concerning the telephone calls to the "Kansas number" together with the deponent's testimony in the deposition at the time her deposition was given that she lived in North Kansas City and that she had moved frequently during the preceding three years, that she spent some time in Jackson and Platte Counties in the meantime, and had spent some time in the State of Kansas, was sufficient so that the court on appeal would not say that the trial court had abused its discretion in admitting the deposition.

■ The trial court in this case never ruled on whether this deposition of Mr. Williams was admissible or could be read in evidence for the reason that the witness had gone out of the state. Therefore, the appellant was deprived of the opportunity to either produce more evidence to support its position that the deposition was admissible on that ground or to read into evidence the testimony of the agent who handled the negotiations with the Gamels and whose testimony was, in the face of Mrs. Gamel's testimony, most crucial to any defense the appellant might have had. Under these circumstances we conclude that the error of the trial court in excluding Mr. Williams' deposition was prejudicial and entitles the appellant to a new trial.

We do not reach appellant's second point nor respondents' contention that the decree should be modified so as to cancel and render null and void the note and deed of trust dated November 26, 1966; and recorded at Book 372, pages 86 and 87 of the Records of the Jefferson County Recorder of Deeds.

The cause is reversed and remanded for a new trial.

CLEMENS, P. J., and STEWART, JJ., concur.